IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

CRIMINAL CASE NO.
1:11-CR-13-AT-LTW-2

LEONARDO MANSON,

Defendant.

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING CASE READY FOR TRIAL

Pending before this Court are Defendant Leonardo Manson's ("Defendant") Motion to Suppress Evidence, Motion to Suppress Eyewitness Identification, and Motion to Suppress Statements. Docket Entries [29, 30, 31]. This Court convened a suppression hearing with respect to the above-listed motions on August 19, 2011 (Docket Entry 52), after which Defendant submitted a post-hearing brief in support of his motions to suppress evidence, eyewitness identification, and statements. Docket Entry [55]. The Government has filed a response in opposition to Defendant's motions. Docket Entry [57]. Defendant filed a reply in support of his motion to suppress statements. Docket Entry [61].

Having considered Defendant's motions and all supporting documents submitted, and for the reasons set forth below, this Court **RECOMMENDS** that Defendant's Motion to Suppress Evidence be **DENIED**, (Docket Entry [29]), Defendant's Motion

to Suppress Eyewitness Identification be **DENIED**, (Docket Entry [30]), and Defendant's Motion to Suppress Statements be **DENIED**, (Docket Entry [31]).

## I.   FACTUAL BACKGROUND

On January 18, 2011, the Grand Jury entered a six-count indictment against Defendant for engaging in the business of dealing in firearms without being licensed under federal law as a dealer in violation of 18 U.S.C. §§ 371, 922(a)(1)(A), and 924(a) and receiving, possessing, concealing, storing, selling or disposing of stolen firearms or stolen ammunition in violation of 18 U.S.C. §§ 371, 922(j), and 924(a); knowingly possessing certain shotguns and a rifle as a convicted felon in violation of 18 U.S.C. §§ 2 and 922(g)(1); knowingly receiving, transferring, and possessing certain shotguns that were not registered to him in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. §§ 5841, 5845, 5861(d), 5871 and 18 § U.S.C. 2; knowingly and unlawfully possessing, concealing, storing, bartering, selling and disposing of stolen firearms in violation of 18 U.S.C. §§ 2, 922(j), and 924(a)(2); knowingly possessing certain pistols and rifles as a convicted felon in violation of 18 U.S.C. §§ 2 and 922(g)(1); and knowingly possessing ammunition as a convicted felon in violation of 18 U.S.C. §§ 2 and 922(g)(1).

### A.   The Search of Co-Defendant Darron Green's Home at 1620 Derry Avenue

On September 26, 2010, while on patrol in Zone 4, Atlanta Police Department ("APD") Officer Jesse Barmettler responded to a "shots fired" call at 1620 Derry

Avenue, S.W. in Atlanta, Georgia. (Transcript ("Tr."), Docket Entry [52], 12). Specifically, the radio dispatch advised that the 911 caller reported that "shots were being fired from inside the residence at 1620 Derry" Avenue. (Tr. 12-13, 30-31). Officer Barmettler was the first APD officer to arrive on the scene, approximately five to six minutes after the radio dispatch call. (Tr. 13, 31). At least five additional APD officers arrived shortly thereafter. (Tr. 13). Officer Barmettler and the other officers established a perimeter around the home at 1620 Derry Avenue and took positions next door at 1624 Derry Avenue. (Tr. 13-14).

Officer Barmettler described the residence at 1620 Derry Avenue as a "bright blue" two-story home with white trim. (Tr. 14). The residence had a main level with an attic above it and a window above the front door. (Tr. 14). Other windows to the residence appeared covered or blocked with blankets, cloth, curtains or other objects from inside of the residence. (Tr. 14, 33). However, one "large window" to the left of the front door (if facing the residence) remained uncovered, and Officer Barmettler could partially see inside the residence through that window from his position next door. (Tr. 15).

Approximately three to four minutes after the APD officers established a perimeter around 1620 Derry Avenue, Officer Barmettler observed a "curtain move" from inside the residence, and then observed a Hispanic woman look out the window. (Tr. 15-16). Officer Barmettler made "eye contact" with the woman, identified himself, and asked her to come to the front door. (Tr. 15, 33-34). In response, the woman "put

3

the curtain blind back down." (Tr. 15). Using the public announcement system from his patrol vehicle, Officer Barmettler identified himself as an APD officer, stated that they were investigating a "shots fired call," and asked that anyone in the residence "come out with their hands visible." (Tr. 16). After repeating himself over the public announcement system three times and approximately three to four minutes after Officer Barmettler first saw the Hispanic woman through the window, the woman and two adolescent children (a boy and a girl) exited the residence with their hands visible. (Tr. 16, 34).

As they exited the residence, Officer Barmettler instructed the Hispanic woman and two children to walk towards him near 1624 Derry Avenue, where he was positioned behind a mini-van. (Tr. 16-17). Neither the Hispanic woman nor the two children appeared to have any physical injuries. (Tr. 17). The Hispanic woman, who identified herself as Cynthia Caja, the lessee of the residence at 1620 Derry Avenue, appeared to be frightened. (Tr. 17, 27, 34). Ms. Caja said she was frightened because of the number of police present at her residence and because there had been boys shooting on the side of her house. (Tr. 34-35). Ms. Caja further stated that the boys, who had been firing weapons on the side of her house, ran off through a hole in the fence in the backyard prior to the APD officers arriving on the scene. (Tr. 17). Officer Barmettler asked Ms. Caja if there was anyone else in the residence, and she replied that no one was in the residence except herself and the two children. (Tr. 20). While Officer Barmettler spoke to Ms. Caja, he maintained a line of sight on the residence at 1620

4

Derry Avenue. (Tr. 17). Officer Barmettler also asked the two children, whom he believed to be fourteen and fifteen, if they had any information about the gunshots being fired, and they responded that they did not know what was going on. (Tr. 35).

After speaking to Ms. Caja and the children, Officer Barmettler began to walk towards the front of the residence at 1620 Derry Avenue to speak with his colleagues. (Tr. 18). After taking a couple of steps, Officer Barmettler observed, through the "large window" to the left of the front door, "a large person fall through the ceiling" of the residence and into the living room. (Tr. 18). Officer Barmettler also heard a "large thud sound as the person fell through the ceiling onto the floor." (Tr. 19). A couple of seconds later, that person exited the residence and placed his hands in the air at the command of the APD officers. (Tr. 19). Officer Barmettler described the person, later identified as co-Defendant Darron Green ("Green"), as a tall, African-American man, with a large build. (Tr. 19-20). Green was detained, and Officer Barmettler escorted him to a patrol vehicle. (Tr. 19). While escorting Green to the patrol vehicle, Officer Barmettler noticed pieces of insulation and dust on Green's clothing and in his hair. (Tr. 19-20). Green stated that he had been asleep and repeatedly asked what was going on. (Tr. 20, 36).

After detaining Green, Officer Barmettler went back to Ms. Caja to ask her additional questions. (Tr. 20). Ms. Caja told Officer Barmettler that Green was her boyfriend and that he had been in the bathroom. (Tr. 20, 37). When Officer Barmettler asked Ms. Caja why she initially failed to mention that Green was in the residence, Ms.

5

Caja did not respond. (Tr. 21). At that point, Officer Barmettler detained Ms. Caja. (Tr. 21). After detaining Ms. Caja, Office Barmettler asked Ms. Caja again whether anyone else was still in the residence. (Tr. 21). Ms. Caja did not respond. (Tr. 21).

From there, Officer Barmettler, with his firearm drawn and along with other APD officers, conducted a "quick visual inspection for people" (victims or suspects) inside of the residence at 1620 Derry Avenue. (Tr. 21). They "swept" the entire downstairs of the residence, which included a living room, dining room, kitchen, and three bedrooms. (Tr. 21-22). In the living room, Officer Barmettler observed debris and insulation on the couch and a "large hole in the ceiling," presumably through which Green had been observed falling. (Tr. 22). On a free-standing bar between the living room and dining room, Officer Barmettler observed four prescription drug bottles and "a lot of clear plastic sandwich baggies bundled with a leafy substance" that appeared to be marijuana. (Tr. 22, 39-40). The sweep of the downstairs took approximately one minute, and the officers did not find any individuals there. (Tr. 22-23).

Next, the officers swept the upstairs of the residence. (Tr. 23). The upper level of the residence was an open area that appeared to be configured as a bedroom. (Tr. 23). There was a door leading to a bathroom and a "small door" leading to a crawl space. (Tr. 23). As the officers walked up the stairs, Officer Barmettler detected the odor of "raw marijuana," and the other two APD officers indicated that they smelled "something too." (Tr. 23). Located on the railing of the stairwell, Officer Barmettler saw a "City of Atlanta police patch surrounded by blue [uniform, shirt] material." (Tr. 23-24, 40).

In the bedroom area, Officer Barmettler observed a small, pink plastic baggie that contained what appeared to be marijuana. (Tr. 24). Officer Barmettler also observed an open lockbox on the dresser with a "chrome handgun" inside. (Tr. 24). In addition to the contraband, Officer Barmettler observed family photographs by a mirror that included Ms. Caja, Green, and the two adolescent children. (Tr. 24-25).

The officers who accompanied Officer Barmettler discovered a person, who identified himself as "Errol Manson" but who was subsequently identified as Defendant Leonardo Manson, hiding in the crawl space. (Tr. 25-26). Officer Barmettler looked inside the crawl space and discovered a firearm "right in the area where [Defendant] had been hiding," and also noticed a hole at the opposite end of the crawl space from where Defendant was found that was consistent with the hole in the ceiling in the living room. (Tr. 25-26). Officer Barmettler did not observe any injuries on Defendant. (Tr. 26). At some point after being detained by the APD officers, Defendant advised another officer present that he (Defendant) lived at the residence at 1620 Derry Avenue. (Tr. 42). The entire sweep of the residence lasted approximately two minutes. (Tr. 29).

Following the sweep of the residence, Officer Barmettler spoke with Ms. Caja again. (Tr. 27). Ms. Caja stated that Defendant was Green's friend, that he had been there to visit Green, and that she thought that he had left earlier in the day. (Tr. 27, 39). Officer Barmettler then asked Ms. Caja, as the apparent lessee, if she would consent to a search of the residence. (Tr. 27). Ms. Caja verbally consented to the search of the residence. (Tr. 28). Ms. Caja also executed a written "Consent to Search

Form–Premises," upon which she indicated that she understood her rights by initialing each point listed.[1] (Tr. 28; Ex. 3). Officer Barmettler did not force or threaten Ms. Caja, nor did he promise her anything in return for her permission to search the residence. (Tr. 29).

During the search of the residence, the officers recovered two additional firearms: one firearm underneath the couch in the living room (underneath the hole through which Green fell), and a sawed-off shotgun in a front room apparently used for storage. (Tr. 40-41). They recovered several bags from the crawl space (gym, duffel, laptop case, and "GPS") as well as a City of Atlanta "duty bag," containing APD equipment and credential holders for federal agents. (Tr. 43-44). They also discovered several shell casings on the side of the residence, which appeared to be recently discharged. (Tr. 32). The officers, however, did not discover any documents or other tangible items in the name of Defendant or "Errol Manson" (the name Defendant gave officers), but did discover some mail addressed to Ms. Caja. (Tr. 29, 43).

---

[1] The APD "Consent to Search Form–Premises" provides the following: "(1) I have not been promised anything in exchange for my consent to search; (2) I have the right to refuse my consent to search; (3) I have the right to revoke my consent to search at any moment; (4) I have not been physically or mentally threatened or compelled to give my consent, and; (5) I can read, write, and understand the English language." (Ex. 3). Ms. Caja placed her initials next to each point, indicating that she understood what Officer Barmettler was asking of her, and signed the form. (Tr. 28).

**B.    Defendant's December 17, 2010 Statements to Law Enforcement[2]**

At approximately 1:00 p.m. or 2:00 p.m. on December 17, 2010, Alcohol, Tobacco, and Firearms ("ATF") Special Agent Allan McLeod, along with an APD task force officer assigned to the ATF, interviewed Defendant in front of the residence at 1620 Derry Avenue. (Tr. 58, 60). Special Agent McLeod, along with other federal agents, were executing a federal search warrant on the residence at 1620 Derry Avenue and a federal arrest warrant on Green. (Tr. 58). Earlier in the day, law enforcement conducted air surveillance of Defendant and Green as they left the residence at 1620 Derry Avenue and observed Defendant and Green driving around, canvassing vehicles and attempting to break into them. (Tr. 58-59). The surveillance lasted a few hours. (Tr. 87). Viewing Defendant and Green as a threat to public safety, federal law enforcement detained Defendant and Green in the Lenox Mall-Brookhaven area and transported them back to the residence at 1620 Derry Avenue. (Tr. 59). By the time Defendant arrived at 1620 Derry Avenue, he was under arrest for having given an alias (false information) to an APD officer. (Tr. 59-60).

---

[2] In his initial motion, Defendant seeks to suppress statements that he made on or about October 5, 2010, and December 17, 2010. Docket Entry [31]. Defendant also indicated that he would challenge any statement that may have been made to APD officers on September 26, 2010, the day officers responded to the "shots fired" call, if evidence of any such statement was presented. (Id.) At the suppression hearing, the Government did not present evidence of any statement made by Defendant on September 26, 2010. As to the October 5, 2010 statement, in his post-hearing brief, Defendant "concede[d] that he does not have a legitimate basis to argue that the Court should suppress the statements given at the Fulton County Jail on October 5, 2010." (Def. Mot., Docket Entry [55], 10). Accordingly, only facts related to the statements made on December 17, 2010 are presented here.

When Special Agent McLeod approached Defendant in front of the residence at 1620 Derry Avenue, Defendant was handcuffed with his hands behind him. (Tr. 60). Special Agent McLeod, who was dressed in an ATF t-shirt with a firearm in a holster on his hip, asked Defendant if he remembered him, and Defendant stated that he did.[3] (Tr. 61). Special Agent McLeod showed his credentials to Defendant and advised him that law enforcement was at the residence to execute a search warrant. (Tr. 61-62). Before Special Agent McLeod could advise Defendant of his rights, Defendant stated that he knew and understood his rights. (Tr. 62). Nevertheless, Special Agent McLeod stated that he would still recite them to him, and Special Agent McLeod then read the Miranda v. Arizona[4] warnings to Defendant from a pre-printed Miranda card. (Tr. 62; Ex. 4). As Special Agent McLeod read the Miranda warnings to Defendant, Defendant "basically spoke in conjunction with [him] at the same time going down the list of rights and recited them very accurately." (Tr. 62). Special Agent McLeod continued to read the Miranda warnings to Defendant until he had fully advised Defendant of his rights. (Tr. 62). Having advised Defendant of his Miranda rights, Special Agent McLeod asked Defendant if he understood his rights, to which he responded yes. (Tr. 62). Special Agent McLeod then asked Defendant if he wished to waive his rights and to speak to law enforcement, to which he responded affirmatively. (Tr. 62-63).

---

[3] Special Agent McLeod previously interviewed Defendant on October 5, 2010, at the Fulton County Jail. (Tr. 50-51).

[4] 384 U.S. 436 (1966).

Defendant appeared agitated, but did not appear to be under the influence of any alcohol or drugs. (Tr. 63). Special Agent McLeod attributed Defendant's agitation to Defendant's realization that law enforcement did not have a federal arrest warrant for him and had he not given a false name to the APD officers, he would probably not have been detained at that time. (Tr. 63). Defendant appeared to understand Special Agent McLeod's questions, and Defendant's answers were responsive to those questions. (Tr. 63). In particular, Defendant shared that he and Green "break into vehicles and . . . share the money together from the sale of firearms and electronics." (Tr. 91). Defendant further explained that he was "the white collar guy," which meant that "he would sell the stolen MacBook computers, the iPods, the iPads, and Mr. Green would sell the majority of the firearms, and . . . they would split the proceeds from it." (Tr. 91).

Defendant did not ask any questions regarding his <u>Miranda</u> rights. (Tr. 63). Neither Special Agent McLeod nor the other officer present threatened Defendant, promised him anything, or physically touched or handled him in any way. (Tr. 63-64). Neither Special Agent McLeod nor the other officer present removed his firearm from the holster during the interview. (Tr. 61). The other officers on the scene, who were executing the search warrant and "holding the scene," were not surrounding Defendant or flanking him. (Tr. 90). After five to eight minutes of questioning, Defendant requested an attorney, at which time Special Agent McLeod stopped asking questions and walked away. (Tr. 64).

## C.    Eyewitness Photo Identification of Defendant

On November 18, 2010, a confidential informant ("CI") working with ATF purchased multiple firearms and a bullet-proof vest from Green at the residence at 1620 Derry Avenue. (Tr. 68). The transaction occurred in the living room of the residence. (Tr. 68-69). During the transaction, Green walked to the front left bedroom immediately off the living room and asked an individual where he had put the bullet-proof vest, apparently awaking that person. (Tr. 68, 76). The CI remained in the living room and did not see or hear the second person in the bedroom. (Tr. 68-69, 76). Shortly after the transaction, at a staging location near the residence, Special Agent McLeod showed the CI a single photograph of Defendant and asked him whether he could identify the individual in the bedroom. (Tr. 69, 72, 80). The CI stated that he could not identify the person because he "just never got a good look at his face." (Tr. 69). Special Agent McLeod showed the CI the single photograph of Defendant because Defendant was the only person that the investigation team had identified as having some involvement with the residence at 1620 Derry Avenue based on the events of September 26, 2010, and, for informational purposes, the team wanted to know whether Defendant had returned to the residence. (Tr. 80).

On November 22, 2010, the CI met with Green at the residence at 1620 Derry Avenue. (Tr. 69). The CI walked into the residence and a person, described as a "shorter black male," immediately walked into the front left bedroom off the living room and closed the door. (Tr. 69). The CI saw that person's back, the back of his head, and

12

body size and type, but did not see his face. (Tr. 69). Special Agent McLeod did not show the CI any photographs or arrays that day because the CI said he did not get a good look at the person's face. (Tr. 81).

On November 29, 2010, at sometime between 11:00 a.m. and 2:00 p.m., the CI purchased firearms from Green. (Tr. 67, 69). The transaction occurred in Green's vehicle in the driveway of the residence at 1620 Derry Avenue. (Tr. 67, 69). Special Agent McLeod recalled that the day was a normal, sunny Fall day, and a bed sheet hung over the living room window of the residence. (Tr. 86). After the transaction, the CI asked to use the bathroom inside the residence in order to ascertain the identity of the individual, whom he believed he had previously seen in the residence on November 22, 2010, and whom he believed was present in the residence on November 18, 2010. (Tr. 67, 70). Upon entering the residence, the CI noticed an individual seated on the couch, later identified as Defendant. (Tr. 67, 70). The person immediately arose from the couch, walked towards the CI and the front door, then walked away from the CI, around the couch, into the front left bedroom off the living room, and closed the door. (Tr. 67-68, 70, 85). The CI "got a very clear look at [the person's] face." (Tr. 70). The CI used the bathroom and then left the residence. (Tr. 71). The CI thereafter met ATF agents at a staging location near the residence at 1620 Derry Avenue. (Tr. 71).

At the staging location, Special Agent McLeod began to ask the CI about the transaction, but the CI immediately asked to see the single photograph that he (Special Agent McLeod) had previously shown him (the CI) on November 18, 2010. (Tr. 71-72).

The CI explained that he got a "good look" at the man's face in the residence, and he would be able to determine if the person in the residence was the same person in the photograph. (Tr. 71). Special Agent McLeod showed the single photograph of Defendant to the CI, and the CI immediately identified the person in the photograph (Defendant) as the same person that he had just seen in the residence. (Tr. 72). Special Agent McLeod did not say anything to the CI when he showed him the single photograph, but the CI stated that he was "100 percent certain" that the person in the photograph was the same as the person in the residence. (Tr. 73). The CI elaborated on Defendant's appearance on that day (November 29, 2010), noting that his hair appeared "more unkempt and longer" than his appearance in the photograph. (Tr. 72). According to Special Agent McLeod, approximately ten minutes transpired from the time the CI saw the person in the residence and the time that he identified Defendant in the single photograph. (Tr. 72). Special Agent McLeod did not show the CI a photographic line-up at that time because he and the CI were in a vehicle and because the CI specifically asked to see the single photograph he had been previously shown. (Tr. 83).

## II.     LEGAL ANALYSIS

### A.     Motion to Suppress Evidence

Defendant seeks to suppress the evidence that APD officers obtained during their search of Green's home at 1620 Derry Avenue on September 26, 2010. Docket Entry [29]. Defendant argues that the police's search of the home was unreasonable because the search was not justified by probable cause, exigent circumstances, valid consent, or

14

a warrant. (Id.) Defendant further argues that he has standing to contest the search of the residence because "he was a social visitor/guest at the residence and was there present for a legitimate purpose." (Id.) In Defendant's perfected post-hearing brief, he adds that in addition to having standing to contest the search of 1620 Derry Avenue because he was a social guest/visitor at the time, he also has standing because in a police report regarding the incident, one officer said that Defendant told him that he (Defendant) resided at 1620 Derry Avenue and because the house appeared to be a real family home rather than a classic stash house. Docket Entry [55]. Defendant further argues that the verbal and written consent of Cynthia Caja, the lessee, to allow the officers to search the home, was not voluntary and therefore invalid. (Id.)

1. Defendant Lacks Standing to Challenge the Search of 1620 Derry Avenue

The Fourth Amendment of the Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. This means that governmental intrusion into those places where an individual can establish a reasonable expectation of privacy is barred. See Katz v. United States, 389 U.S. 347, 353 (1967). "'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.'" Rakas v. Illinois, 439 U.S. 128, 134 (1978) (internal citations omitted). Consequently, a defendant who alleges a Fourth Amendment violation "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable."

15

Minnesota v. Carter, 525 U.S. 83, 88 (1998). More precisely, a defendant must demonstrate both a subjective and an objective expectation of privacy to challenge a search. United States v. Segura-Baltazar, 448 F.3d 1281, 1286 (11th Cir. 2006). "The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the [privacy] expectation be one that society is prepared to recognize as reasonable." United States v. Robinson, 62 F.3d 1325, 1328 (11th Cir. 1995) (citations and quotations marks omitted). A defendant bears the burden of showing a legitimate expectation of privacy in the area searched. United States v. Brazel, 102 F.3d 1120, 1147-48 (11th Cir. 1997).

Defendant argues that he may contest the search of 1620 Derry Avenue because he was a social visitor/guest, who was present for a legitimate purpose. Specifically, Defendant notes that Ms. Caja indicated that Defendant was a friend of co-Defendant Green's and had been visiting Green at the residence. Ms. Caja, the lessee, had not barred Defendant from the residence nor had she asked him to leave.

Defendant anchors his argument in the holding of Minnesota v. Olson, 495 U.S. 91 (1990), in which the Supreme Court held that a defendant's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." Id. at 96-97. Defendant, however, has not produced any evidence (or even alleged any facts) to show that he was ever an overnight guest at 1620 Derry Avenue. Defendant also has not explained why the holding and rationale of Olson should be extended to include a social visitor/guest who

16

is not also an overnight guest.

More applicable to the facts of this case is <u>United States v. Rackley</u>, 742 F.2d 1266 (11th Cir. 1984), a case to which the Government directs this Court. In <u>Rackley</u>, two defendants, Rackley and Crosby, moved to suppress the introduction of cocaine and all physical evidence obtained in the search of the home that a third defendant, Sanders, leased. <u>Id.</u> at 1269. The evidence showed that defendant Rackley "was a friend who often stayed in the house," had a key to the house, and had "the right to exclude others from the house," but "did not store items in the house when he was not in town," "only slept in the guest room," and "had not stayed at the house the night before the raid." <u>Id.</u> The Eleventh Circuit, referring to defendants Rackley and Crosby as "mere guests on the premises leased by Sanders," concluded that "neither Crosby nor Rackley had a legitimate expectation of privacy to afford them standing to contest the search of the house." <u>Id.</u> at 70. Explaining further, the court stated that the testimony regarding defendant Rackley "suggests that Rackley's expectation of privacy, if it existed at all, was limited to the guest bedroom where he stayed, whenever he stayed there," and "Crosby, who never stayed overnight, does not possess even a possibility of a valid privacy expectation in the house." <u>Id.</u>

Defendant's status with respect to 1620 Derry Avenue is similar to defendant Crosby in that Defendant has not offered any evidence that he stayed overnight at 1620 Derry Avenue. Moreover, Defendant presents far less evidence of a connection to the residence at 1620 Derry Avenue than defendant Rackley, who still was found to have

17

no standing to contest the search of the residence at issue in the Rackley opinion. As such, the undersigned concludes that Defendant has not established that he has a legitimate expectation of privacy in the residence at 1620 Derry Avenue such that he may contest the search of the residence. See United States v. Campbell, 434 F. App'x 805, 810 (11th Cir. 2011) (holding that defendant, who testified that he did not live in the house that was searched and where the evidence showed that the defendant did not lease the house, did not have standing to challenge the search of the house); Brazel, 102 F.3d at 1148 (holding that defendant, who offered no evidence "to show that he was the tenant or had an unrestricted right of occupancy or control in the apartment at the time of the search" and where the evidence showed that the defendant was not the lessee and was not paying rent for the apartment, did not have standing to challenge the search of the apartment); United States v. Baron-Mantilla, 743 F.2d 868, 870 (11th Cir. 1984) (holding that defendant, who neither owned nor rented the searched apartment, did not have the telephone number for the apartment listed in his name, and who did not present any witness testimony to corroborate his claim that he lived in the apartment with his mistress, did not have standing to challenge the search of the premises, even though he possessed a key to the apartment).

To the extent Defendant suggests that his alleged statement to a police officer on the scene on September 26, 2010, that he resided at 1620 Derry Avenue confers standing on him, Defendant's argument is unfounded. Even if Defendant could overcome the

evidentiary challenges noted by the Government,[5] this single, unsupported assertion–that Defendant has now distanced himself from–is insufficient to establish that Defendant had a legitimate expectation of privacy in the residence at 1620 Derry Avenue. See United States v. Richardson, 764 F.2d 1514, 1527 (11th Cir. 1985) ("[A]llegations of standing alone will not suffice to obtain . . . the suppression of evidence"); see also United States v. Cooper, 203 F.3d 1279, 1284 (11th Cir. 2000) (defendants' reference to the searched hotel room as "theirs" without accompanying facts to prove the truth of this conclusion was insufficient to establish defendants' privacy interests in the hotel room).

Lastly, Defendant argues that he has standing to contest the search because the edifice at 1620 Derry Avenue appears to be a real home rather than the classic stash house. Defendant, however, cites to no authority–and this Court is aware of none–that supports the proposition that he can establish a legitimate expectation of privacy in the residence at 1620 Derry Avenue simply by demonstrating the character of the residence as a family home versus a stash house.

Because Defendant has not established that he has legitimate expectation of privacy in the residence at 1620 Derry Avenue, he does not have standing to contest the search, and this Court need not address Defendant's arguments about whether or not exigent circumstances were present to permit the officers' search of the premises

---

[5] The Government notes that this statement is embedded in multiple levels of hearsay, and the police report in which this statement appears was not introduced into evidence at the suppression hearing. (Gov't Resp., Docket Entry [57], 18).

without a warrant and whether Ms. Caja's oral and written consent to the search of the residence was voluntary. Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Evidence be **DENIED**. Docket Entry [29].

## B. Motion to Suppress Statements

Next, Defendant seeks to suppress statements that he made to Special Agent McLeod on December 17, 2010. Docket Entries [31, 55]. Defendant contends that these statements, obtained after he was stopped on a pretense, arrested, handcuffed, transported across town to a location where a host of officers were searching a private residence, and where he was questioned by armed law enforcement agents, were made involuntarily.

The Fifth Amendment of the United States Constitution prohibits the use of an involuntary confession against a defendant in a federal criminal trial. U.S. Const. amend. V; Dickerson v. United States, 530 U.S. 428, 433 (2000); Bram v. United States, 168 U.S. 532, 542 (1897). "To determine whether a confession is voluntary, the court must assess 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" Waldrop v. Jones, 77 F.3d 1308, 1316 (11th Cir. 1996) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). The totality of the circumstances test to determine voluntariness of a confession turns primarily on the presence of "police overreaching," and relevant factors include the "'accused's lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged

nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.'" Id. (internal citations omitted).

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court recognized the need to further safeguard the privilege against self-incrimination by requiring that Miranda warnings, or other fully effective means, be given to subjects of custodial interrogations. Miranda, 384 U.S. at 478-79; see also Dickerson, 530 U.S. at 442-43 (rejecting Congress's attempt through 18 U.S.C. § 3501 to reinstate the totality test as sufficient). The right to Miranda warnings, however, does not attach until the initiation of a custodial interrogation. United States v. Acosta, 363 F.3d 1141, 1148 (11th Cir. 2004); see also United States v. Grimes, 142 F.3d 1342, 1349 (11th Cir. 1998) (applying Miranda only if defendant was both (a) in custody and (b) being interrogated at the time the statements were made). A defendant is in custody for purposes of Miranda when there has been a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted)).

Here, the parties do not dispute that Defendant was in custody at the time Special Agent McLeod questioned him on December 17, 2010, and therefore, Special Agent McLeod was required to advise Defendant of the Miranda warnings. Defendant concedes that Special Agent McLeod properly advised him of his Miranda rights.

Turning to the voluntariness inquiry, the undersigned finds that Defendant's

statements to Special Agent McLeod after receiving the <u>Miranda</u> warnings were voluntary. First, although there is no evidence in the record about Defendant's education or intelligence, there is also nothing in the record to suggest that Defendant's lack of education and/or low intelligence prevented him from understanding that he was voluntarily speaking to Special Agent McLeod. To the contrary, Defendant's characterization of himself as "the white collar guy" in the operation with Green seems to suggest that Defendant's level of education and/or intelligence would allow him to appreciate that he was speaking to Special Agent McLeod of his own accord. Second, Special Agent McLeod advised Defendant of his <u>Miranda</u> rights. In fact, Defendant recited the <u>Miranda</u> warnings along with Special Agent McLeod "very accurately." Third, Special Agent McLeod only interviewed Defendant for five to eight minutes before Defendant asked for a lawyer, and the questioning ceased. Fourth, even though Defendant was handcuffed, federal law enforcement were searching a nearby private residence, and both Special Agent McLeod and the other officer present for the interview were armed, neither of the officers had any physical contact with Defendant, and there is no evidence of the use of physical punishment or violence towards Defendant. Additionally, there was no evidence that the additional officers on the scene were "surrounding or flanking" Defendant in a manner that was intimidating or threatening. Fifth, Special Agent McLeod and the other officer present for the interview did not threaten Defendant and did not make any promises to Defendant in exchange for him speaking to them. <u>See</u> <u>United States v. Teague</u>, No. 2:10-cr-006-RWS-SSC, 2010

WL 6529640, at * 22 (N.D. Ga. Nov. 12, 2010) ("A statement is not given voluntarily if it is 'extracted by any sort of threats or violence, or obtained by any direct or implied promises, or by the exertion of any improper influence.'" (quoting Harris v. Dugger, 874 F.2d 756, 761 (11th Cir. 1989), cert. denied, 493 U.S. 1011 (1989)). Considering the totality of the circumstances surrounding Special Agent McLeod's December 17, 2010 interrogation of Defendant, this Court concludes that Defendant statements to Special Agent McLeod were made voluntarily. Indeed, Defendant demonstrated that he understood that his conversation with Special Agent McLeod was voluntary because Defendant promptly ended the conversation with Special Agent McLeod after only five to eight minutes by requesting an attorney. As a result, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Statements be **DENIED**. Docket Entry [31]. See Agee v. White, 802 F.2d 1487, 1495 (11th Cir. 1987) (concluding that confession was properly submitted into evidence where defendant voluntarily waived his Miranda rights).

### C. Motion to Suppress Eyewitness Identification

Finally, Defendant moves to suppress the CI's photo identification on the ground that presenting the CI with a single photograph of Defendant on two occasions when the CI only briefly saw Defendant once was unduly suggestive and resulted in an unreliable identification.

In Foster v. California, 394 U.S. 440 (1969), the Supreme Court recognized that, under a totality of the circumstances standard, the conduct of identification procedures

may be "so unnecessarily suggestive and conducive to irreparable mistaken identification as to be a denial of due process of law." Id. at 442 (internal quotation marks omitted); see also Simmons v. United States, 390 U.S. 377, 384 (1968) (holding that "each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification"). The linchpin in determining the admissibility of identification evidence is reliability. Manson v. Brathwaite, 432 U.S. 98, 114 (1977). "It is the likelihood of misidentification which violates a defendant's right to due process." Neil v. Biggers, 409 U.S. 188, 198 (1973).

In the Eleventh Circuit, a two-step analysis is used to determine whether the admission of an out-of-court identification violates due process. United States v. Diaz, 248 F.3d 1065, 1102 (11th Cir. 2001) (citing Cikora v. Dugger, 840 F.2d 893, 895 (11th Cir. 1988)). First, the court must determine whether the original identification procedures were unduly suggestive. Id. If the procedures were unduly suggestive, then the court must consider whether, under the totality of circumstances, the identification was nonetheless reliable. Id.

### A. **Suggestiveness**

The Government concedes that showing the CI the single booking photograph of Defendant from the Fulton County Jail website was unduly suggestive.

24

**B.     Reliability**

Even a single-picture photo display, however, can be admissible if the identification is otherwise reliable. Manson, 432 U.S. at 114-116. For an identification to be unconstitutionally unreliable, there must be a substantial risk of misidentification. United States v. Walls, 237 F. App'x 599, 601 (11th Cir. 2007), (citing Johnson v. Dugger, 817 F.2d 726, 729 (11th Cir. 1987)). Factors to be considered in determining reliability of an identification include: "the opportunity of the witness to view the [defendant] at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the [defendant], the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Manson, 432 U.S. at 114; Biggers, 409 U.S. at 199-200; Diaz, 248 F.3d at 1102. In this case, four of the five factors weigh in favor of a reliable identification.

First, the CI had ample opportunity to view Defendant during their encounter on November 29, 2010. The CI entered the residence during the day, a day which Special Agent McLeod recalled to be a normal, sunny Fall day. According to the CI, he saw Defendant's face when he first entered the residence, and Defendant walked towards him before entering the front left bedroom. The CI stated that he "got a very clear look at his face." (Tr. 70). Second, the CI had a heightened degree of attention. The CI created an excuse to enter the residence with the sole purpose of trying to identify the person he had previously seen in the residence on November 22, 2010, and whom he thought was in the residence on November 18, 2010. Therefore, it stands to reason that

Defendant carefully observed the person he stood face-to-face with in the residence so that he could attempt an identification later. Third, the CI was absolutely certain that he could identify Defendant after he saw him on November 29, 2010. Upon arriving at the staging area ten minutes after leaving the residence at 1620 Derry Avenue, the CI asked to see the single photograph Special Agent McLeod had shown him on November 18, 2010. The CI immediately identified the photograph of Defendant as the person he had just seen in the residence and stated that he was "100 percent certain" that the person in the photograph was the individual in the residence. Fourth, the short period of time that elapsed between the time the CI saw the person in the residence and the time he made the identification weighs in favor of reliability. Only ten minutes had elapsed between the two events. Compare United States v. Douglas, 489 F.3d 1117, 1127 (11th Cir. 2007) (eight month period between the crime and the in court identification "was not so long as to lead to the conclusion that the identification was unreliable"). Taken together, these factors show that despite the unduly suggestiveness of showing the CI a single photograph of Defendant, the circumstances surrounding the identification make it reliable nonetheless.[6] As a result, the undersigned **RECOMMENDS** that

---

[6] As to the third factor (the accuracy of the witness' prior description of the defendant), the CI did not provide any prior detailed description of Defendant because the CI did not have an opportunity to adequately view the person in the residence on November 18 or November 22, 2010. On November 18, 2010, the CI did not see the person at all. The CI simply knew an individual was in the front left bedroom based on Green's conversation with that individual. On November 22, 2010, the CI briefly saw the person as the person headed towards the front left bedroom. The CI noted that the person was a "shorter black male," but was otherwise unable to provide any other details about the person due to his limited view. Thus, at the time the CI made the

Defendant's Motion to Suppress Eyewitness Identification be **DENIED**.  Docket Entry [30].

## CONCLUSION

For the reasons set forth above, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Evidence be **DENIED,** (Docket Entry [29]), Defendant's Motion to Suppress Eyewitness Identification be **DENIED,** (Docket Entry [30]), and Defendant's Motion to Suppress Statements be **DENIED,** (Docket Entry [31]).  There are no further motions or problems pending before the undersigned to prevent the scheduling of this case for trial.  Therefore, this action is **CERTIFIED READY FOR TRIAL**.

SO ORDERED, REPORTED AND RECOMMENDED this 6 day of December, 2011.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

---

identification on November 29, 2010, he had not previously described Defendant in any detail.  Consequently, this factor is not significant in the analysis here.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

CRIMINAL CASE NO.
1:11-CR-13-AT-LTW-2

LEONARDO MANSON,

Defendant.

## ORDER FOR SERVICE OF REPORT AND RECOMMENDATION

Attached is the report and recommendation of the United States Magistrate Judge made in this action in accordance with 28 U.S.C. § 636 and this Court's Local Rule 72.1C. Let the same be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), within fourteen (14) days after service of this order, each party may file written objections, if any, to the Report and Recommendation. Pursuant to Title 18, United States Code, Section 3161(h)(1)(F), **the above-referenced fourteen (14) days allowed for objections is EXCLUDED from the computation of time under the Speedy Trial Act.**

Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible

for obtaining and filing the transcript of any evidentiary hearing for review by the district court. If no objections are filed, the report and recommendation may be adopted as the opinion and order of the District Court. **Failure to object to this Report and Recommendation waives a party's right appellate review.** Fed. R. Crim. P. 59(b)(2).

The Clerk is directed to submit the report and recommendation with objections, if any, to the District Court after expiration of the above time period.

**SO ORDERED**, this 6 day of December, 2011.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE